UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MAX BLANKFELD, JOHNNY EDWARDS, ADAM FINN, DAVID KLEIN,MARK MEY, ALAN SCHAEFER, FIORE TALARICO, and ROBERT TEH, | Civil Action No. ____________ |
| Plaintiffs, | |
| v. | CLASS ACTION COMPLAINT |
| MERRILL LYNCH & CO., INC. and MERRILL LYNCH PIERCE FENNER & SMITH, INC., | |
| Defendants. | |

## JURISDICTION AND VENUE

1. Plaintiffs' claims arise under Section 14(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78h(d), and the rules and regulations of the Securities and Exchange Commission promulgated thereunder, including SEC Rule 14d-10(a)(1), 17 C.F.R. § 240.14d-10(a)(1).

2. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Plaintiffs assert claims arising under Section 14(d) of the Exchange Act. In addition, the Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(d)(2)(A), in that the matter in controversy exceeds the sum or value of $5,000,000 and Plaintiffs and members of the Class, hereinafter defined, are citizens of states different from any defendants.

3. Venue is proper in this District because Plaintiffs reside in this District; most members of the Class reside in this District; and a substantial number of the events and transactions giving rise to the claims asserted herein occurred in this District.

## THE PARTIES

4. Plaintiffs Max Blankfeld, Johnny Edwards, Adam Finn, David Klein, Mark Mey, Alan Schaefer, Fiore Talarico, and Robert Teh are citizens of the State of Texas residing in Houston, Texas or nearby.

5. Defendant Merrill Lynch & Co., Inc. ("Merrill Lynch") is incorporated in Delaware. Its principal executive offices are located in New York, NY.

6. Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("MLPF&S") is incorporated in Delaware. Its principal executive offices are located in New York, NY.

7. MLPF&S is a wholly-owned subsidiary of Merrill Lynch, and is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act. Unless specifically noted, "Merrill Lynch" refers collectively to defendants Merrill Lynch and MLPF&S.

## AMEGY

8. Amegy Bank N,.A. ("Amegy Bank") is a national banking association, organized under the laws of the United States. Its principal executive offices are located in Houston, Texas.

9. Amegy Investments, Inc. ("Amegy Investments") is a Texas corporation. Its principal executive offices are located in Houston, Texas.

10. Amegy Investments is a wholly-owned subsidiary of Amegy Bank, and is

registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act. Unless specifically noted, "Amegy" refers collectively to Amegy Bank and Amegy Investments. Amegy was a central participant in the events and transactions hereinafter described and is a key non-party witness.

## AUCTION RATE SECURITIES

11. Auction Rate Securities (ARS) are long-term bonds or preferred stock whose interest rates are re-set at predetermined periodic intervals by means of a modified Dutch auction process.

12. In the modified Dutch auction, brokers for potential purchasers submit bids to a broker-dealer designated by the issuer of the ARS. In the bid, potential purchasers specify to the designated broker-dealer the number of bonds or shares they would like to purchase and the lowest interest rate they would be willing to accept for purchasing the bond or preferred stock at par. The bids are collected by the designated broker-dealer and then submitted to an auction agent. The auction agent then assembles the bids and determines the lowest interest rate that would successfully "clear" the auction, by satisfying the supply of available bonds or shares (*i.e.*, the number of bonds or shares that existing holders want to sell).

13. The auction mechanism is supposed to provide liquidity despite the long-term nature of the underlying securities. Holders can dispose of their ARS at any of the regularly scheduled auctions, provided that those auctions clear.

14. Issuers of ARS require a broker-dealer to structure the issue, underwrite and distribute the issue, and provide liquidity to investors through the auction mechanism. Underwriters receive underwriting fees from the issuer of the securities. Merrill Lynch was a

major underwriter of ARS, and received significant fees from underwriting them.

15. On each auction date, the number of ARS available for sale is determined by the number of existing holders who wish to sell or hold their ARS. Holders have three options at auction: 1) Hold at Market, which means the holder will retain its ARS regardless of the new interest rate; 2) Hold at Rate, which means the holder will retain its ARS at a specific minimum rate; and 3) Sell, which is to sell regardless of the new rate. Buyers may bid to buy a new position at a specified minimum rate.

16. The broker-dealer conveys the bids to the auction agent. The agent assembles the bids and determines the clearing rate. Bids at or lower than the clearing rate receive the bonds. The trades are recorded and settled the next business day. An auction "fails" in the event that there are not enough bids to purchase the available supply of ARS at a rate less than or equal to the maximum rate set by the issuer. In that event, all existing holders must continue to hold the ARS until the next auction.

17. Once an ARS fails at auction, it typically continues to fail, as the failure signals to potential purchasers that there may be substantial liquidity risks in purchasing the ARS. If the auctions consistently fail, existing ARS holders cannot liquidate their securities.

18. On or about February 12, 2008, the entire ARS market shut down because large national broker-dealers, including Merrill Lynch, stopped supporting ARS auctions.

## MERRILL LYNCH SELLS THE SECURITIES TO AMEGY AND AMEGY SELLS THEM TO PLAINTIFFS AND THE CLASS

19. The securities held by Plaintiffs and the Class are a sub-set of ARS called Auction Rate Preferred Stock (ARPS), preferred stock issued by closed-end mutual funds. The issuers of the ARPS held by Plaintiffs and the Class are different closed-end municipal funds, most of

which were sponsored and advised by BlackRock, Inc. (BlackRock), a subsidiary of defendant Merrill Lynch, others of which were sponsored and advised by Van Kampen Merritt, Inc. (Van Kampen), and a small portion of which were sponsored and advised by others.

20. Merrill Lynch is one of the largest broker-dealers in the United States and one of the largest underwriters of ARPS. Merrill Lynch was the principal underwriter of the ARPS issued by BlackRock and was a participant in the syndicate which underwrote and distributed the ARPS issued by Van Kampen.

21. Amegy is a regional broker-dealer, with offices in several cities in Texas. Amegy has, for years, been an important part of Merrill Lynch's underwriting distribution network, acting as a conduit for Merrill Lynch's sales force to distribute ARPS and other securities to investors in Texas.

22. The ARPS held by Plaintiffs and the Class were marketed and sold by Merrill Lynch to Amegy so that Amegy could promptly resell them to those of its clients who had expressed interest in purchasing those ARPS, based upon the false and misleading representations Merrill Lynch was making to Amegy, to Amegy clients, and to all other purchasers of the ARPS, as hereinafter described.

**23.** Plaintiffs are clients of Amegy holding ARPS purchased indirectly from Merrill Lynch, at a combined par value of $38.7 million. Approximately 70 clients of Amegy, in all, hold ARPS purchased indirectly from Merrill Lynch, at a combined par value of $140 million.

**MERRILL LYNCH'S MISREPRESENTATIONS TO PURCHASERS OF THE ARPS**

24. Merrill Lynch misrepresented directly to thousands of its clients and potential clients, including Amegy, and, indirectly, to Amegy clients, including Plaintiffs and the Class, that the ARPS Merrill Lynch was marketing and selling were safe, highly liquid investments, equivalent to money market instruments and cash.

25. Merrill Lynch did not make adequate disclosures to Amegy and Amegy's clients that the liquidity of the ARPS depended upon Merrill Lynch's willingness to support the auctions it managed, when there was not enough demand.

26. Merrill Lynch continued to tout the purported liquidity of the ARPS directly to Amegy, and, indirectly, to Amegy clients, including Plaintiffs and the Class, despite Merrill Lynch's awareness of escalating liquidity risks, in the weeks and months preceding the collapse of the ARPS markets on February 12, 2008.

**27.** To their dismay, Plaintiffs and the Class were left holding illiquid securities when Merrill Lynch and other broker-dealers stopped supporting auctions.

**THE ENFORCEMENT PROCEEDINGS AGAINST MERRILL LYNCH**

28. Purchasers of ARS from Merrill Lynch throughout the United States complained vociferously and angrily when the auction markets for the ARS they had purchased collapsed, charging Merrill Lynch with fraud in connection with the sales and marketing of ARS.

**29.** On April 17, 2008, New York Attorney General Andrew Cuomo announced that he had subpoenaed a number of Wall Street broker-dealers, including Merrill Lynch, to determine whether those firms had misled investors by marketing their ARS as cash-like

investments, and the extent to which those firms had stepped in to prevent auctions from failing.

30. By May 5, 2008, it was widely reported that in addition to the industry-wide investigation launched by New York Attorney General Cuomo, other states had organized their own ARS Task Force, spearheaded by William Galvin, Secretary of the Commonwealth of Massachusetts, who had also subpoenaed Merrill Lynch and other broker-dealers to determine whether investors had been properly informed of the risk that their investments might become inaccessible.

31. A major focus of the Cuomo and the Galvin investigations questioned why Merrill Lynch and other broker-dealers decided to stop bidding at the auctions, considering that they had regularly bought unwanted bonds at auction since ARS were introduced in 1988.

32. On July 31, 2008, the Massachusetts Securities Division of Secretary Galvin's office filed an administrative complaint against Merrill Lynch for violating Massachusetts securities laws, containing separate counts of fraud and dishonest conduct for creating and implementing a sales and marketing scheme which significantly misstated not only the nature of the ARS, but also the overall stability of the auction market, resulting in thousands of investors being abandoned with illiquid investments.

33. Particularly egregious, according to the Massachusetts complaint, was the manner in which Merrill Lynch had co-opted its supposedly independent Research Department to assist in sales efforts geared towards reducing its inventory of ARS. Specifically, Merrill Lynch permitted its Sales and Trading, including its Auction Desk managers, to unduly influence and pressure the supposedly independent Research Department by directly requesting and advocating for written research to be published endorsing the safety and liquidity of nearly all types of ARS and recommending that investors buy ARS.

34. In one instance, a Managing Director in charge of Merrill Lynch's auction desk, Frances Constable ("Constable"), directly emailed Martin Mauro ("Mauro"), a Fixed Income Analyst in the Research Department, with the following:

> Any renewed research focusing on the high quality of closed end fund preferreds of ALL tax status, auction municipal bonds and student loan backed bonds, wrapped around the value added proposition with today's rates would be extremely helpful.

35. The Massachusetts complaint sought an order (a) requiring Merrill Lynch to permanently cease and desist from committing any further violations of Massachusetts law; (b) requiring Merrill Lynch to offer rescission of sales of ARS at par (or restitution to investors who had already sold these instruments below par); (c) censuring Merrill Lynch; (d) requiring Merrill Lynch to pay an administrative fine; and (e) requiring Merrill Lynch to take other actions in the public interest and necessary for the protection of Massachusetts investors.

36. In order to resolve pending proceedings, on August 7, 2008, Merrill Lynch announced that, effective January 15, 2009, it would offer to buy at par auction rate securities sold by it to its retail clients. "Our clients have been caught in an unprecedented liquidity crisis," said John A. Thain, Chairman and Chief Executive Officer. "We are solving it by giving them the option of selling their positions to us."

37. Notwithstanding Merrill Lynch's August 7 announcement, on August 15, 2008, New York Attorney General Cuomo announced that he would take imminent legal action against Merrill Lynch, calling its proposal to buy back ARS from investors "woefully inadequate."

38. On August 21, 2008, Merrill Lynch announced that it had reached a global resolution with the New York Attorney General and other state securities regulators to avoid further enforcement proceedings related to its sales of auction-rate securities, and that it had also

reached an agreement in principle with the staff of the SEC.

39. Among other terms of the global resolution, Merrill Lynch agreed to pay a $125 million penalty.

40. "Merrill Lynch's conduct harmed tens of thousands of investors who will have the opportunity to get their money back through this agreement pending Commission approval," said Linda Chatman Thomsen, Director of the SEC's Division of Enforcement.

41. Merrill Lynch agreed to accelerate its previously-announced plans to purchase auction rate securities from its retail clients. Merrill Lynch individual clients, not-for-profit clients and small business clients who had on February 13, 2008 less than $4 million in assets at Merrill Lynch would have a 15-month period beginning on October 1, 2008 and ending on January 15, 2010 in which to sell their ARS to Merrill Lynch at par.

42. No later than January 2, 2009, Merrill Lynch agreed to offer to liquidate at par all ARS from remaining individual and charitable investors, and from small businesses with account values up to $100 million who purchased ARS from Merrill Lynch prior to the collapse of the ARS market in mid-February 2008.

43. Merrill Lynch also said that the vast majority of its clients' holdings are ARPS and municipal ARS, and that its **offer to purchase at par** would remain open through January 15, 2010.

## THE TENDER OFFERS

44. On October 1, 2008, Merrill Lynch commenced an offer to purchase from certain "eligible clients" certain ARS, including ARPS of the type owned by Plaintiffs and the Class,

that were purchased from Merrill Lynch or were purchased from another financial institution but transferred to a Merrill Lynch account prior to August 7, 2008.

45. On January 2, 2009, Merrill Lynch commenced another offer to purchase from another group of "eligible clients" certain ARS, including ARPS of the type owned by Plaintiffs and the Class, that were purchased from Merrill Lynch or were purchased from another financial institution but transferred to a Merrill Lynch account prior to August 7, 2008.

46. The Merrill Lynch offers to purchase ARPS owned by Plaintiffs and the Class were not extended to Plaintiffs and the Class, because they were not "eligible clients" as defined by Merrill Lynch, in that they had purchased their ARPS indirectly from Merrill Lynch through Amegy, and had not transferred their ARPS to Merrill Lynch prior to August 7, 2008.

## CLASS ACTION ALLEGATIONS

47. Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(1) and (b)(2), on behalf of a class consisting of all persons and entities who purchased from Amegy ARPS distributed and marketed by Merrill Lynch, and who continue to hold such securities (the "Class").

48. The members of the Class are so numerous that joinder of all members is impracticable. There are approximately 70 members of the Class who hold ARPS distributed and falsely marketed by Merrill Lynch through Amegy, having a combined par value totaling approximately $140 million.

49. There are questions of law and fact common to the Class, including whether Merrill Lynch's offers to purchase ARPS at par from only its "eligible clients" violated Section 14(d) of the Exchange Act and SEC Rule 14d-10(a)(1).

50. Plaintiffs' claims are typical of the claims of members of the Class.

51. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained experienced securities litigation counsel to prosecute this action, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs do not have interests antagonistic to, or in conflict with, other members of the Class.

52. The prosecution of separate actions by individual members of the Class would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Merrill Lynch; or (b) adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

53. Merrill Lynch has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

54. There will be no difficulty in the management of this action as a class action.

**FIRST CLAIM FOR RELIEF**
**(Under Section 14(d) of the Exchange Act)**

55. Plaintiffs repeat and reallege each of the foregoing allegations.

**56.** The ARPS held by Plaintiffs and the Class were registered with the SEC; and purchases and sales of those securities, including tender offers for those securities, are subject to the provisions of the Securities Exchange Act of 1934 and rules and regulations of the SEC promulgated thereunder.

57. Merrill Lynch's offers to purchase ARPS from its retail clients and other

individual and business investors who purchased ARPS through Merrill Lynch, described in paragraphs 36 through 46 hereof, constitute tender offers, within the meaning of Section 14(d) of the Exchange Act, in that they involved active and widespread solicitation of public holders of ARPS; solicitation made for a substantial percentage of the ARPS outstanding; an offer to purchase made at a premium over the prevailing market price of the ARPS; the terms of the offer firm rather than negotiable; the offer subject to a fixed maximum number of ARPS to be purchased; and the offer open only for a limited period of time.

58. Merrill Lynch's aforedescribed offers to purchase ARPS include ARPS of the type held by Plaintiffs and the Class, but Merrill Lynch arbitrarily excluded Plaintiffs and the Class from its tender offers because they had not bought their ARPS directly from Merrill Lynch or transferred their ARPS to a Merrill Lynch account prior to August 7, 2008.

59. Merrill Lynch's limitation of its tender offers to "eligible clients" who had purchased ARPS directly from Merrill Lynch or had purchased ARPS from other financial institutions but transferred them to accounts opened at Merrill Lynch prior to August 7, 2008, violated Section 14(d) of the Exchange Act:

*Wellman v. Dickinson*, 475 F. Supp.783, 818 (S.D.N.Y. 1979):

> All shareholders of the target are within the class the Act was designed to protect.
>
> * * *
>
> [W]here an offer to purchase was made only to a select group of shareholders, it would certainly defeat the purpose of the Act to deny standing to the shareholders to whom an offer to purchase was not made.

60. Plaintiffs and the Class are shareholders whom the protections of Section 14(d) of the Exchange Act were intended to protect; and they have standing to enforce it.

61. Plaintiffs and the Class have no adequate remedy at law.

**SECOND CLAIM FOR RELIEF**
**(Under SEC Rule 14d-10(a)(1))**

62. Plaintiffs repeat and reallege each of the foregoing allegations.

63. Merrill Lynch's offers to purchase ARPS from certain "eligible customers" was not extended to all holders of the class of securities subject to the tender offers, *viz.*, all holders of the ARPS sponsored and advised by BlackRock, Van Kampen, and others, which Merrill Lynch had marketed and sold directly to its own clients and, indirectly, to others, including Plaintiffs and the Class, in violation of SEC Rule 14d-10(a)(1).

64. SEC Rule 14d-10(f) does not apply because the SEC has not determined that compliance with Rule 14d-10(a)(1) is not necessary or appropriate in the public interest or for the protection of investors.

**65.** Plaintiffs and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiffs respectfully ask this Court for the following relief against Merrill Lynch:

A. a declaratory judgment declaring that Merrill Lynch has violated Section 14(d) of the Exchange Act and SEC Rule 14d-10(a)(1) promulgated thereunder;

B. a mandatory injunction directing Merrill Lynch to extend to Plaintiffs and the Class the offers to purchase it has made to its "eligible clients";

C. compensatory damages, including consequential damages, in amounts to be proved by Plaintiffs and members of the Class;

D. such other and further relief as this Court may deem just and proper; and

E. payment for the benefit of Plaintiffs and the Class of the costs of this action, including the reasonable fees and expenses of their undersigned attorneys and counsel.

Dated: Houston, Texas
January 23, 2009

_/s/ Stephen S. Andrews_____________________
Stephen S. Andrews
Texas State Bar No,. 01250300
Federal I.D. No. 1458
OAKS HARTLINE & DALY, L.L.P.
2323 S. Shepherd Drive, 14th Floor
Houston, TX 77019
(713) 979-5123 (Telephone)
(713) 979-4440 (Fax)
andrews@ohdlegal.com

**ATTORNEYS FOR PLAINTIFFS**

_/s/ Stephen Lowery_________________________
Stephen Lowey
Geoffrey Horn
LOWEY DANNENBERG COHEN & HART, P.C.
1 North Broadway, Suite 509
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
slowey@lowey.com

**OF COUNSEL**